**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| MITEK INC., | ) |
|     Plaintiff, | ) ) ) |
| v. | ) No. 4:23-CV-960 RLW |
| MIKE MCINTOSH, | ) ) ) |
|     Defendant. | ) ) |

**MEMORANDUM AND ORDER**

This matter is before the Court on Plaintiff MiTek Inc.'s Motion for Preliminary Injunction against Defendant Mike McIntosh. (ECF No. 38). The case arises out of the alleged breach of the Covenant of Employment ("Covenant") between MiTek and McIntosh. In its Verified Complaint, MiTek asserts claims for breach of contract, tortious interference with business expectancy, violations of the Defend Trade Secrets Act, 18 U.S.C. § 1831, *et seq*. ("DTSA"), and violations of the Missouri Uniform Trade Secrets Act, Mo. Rev. Stat. § 417.450, *et seq*. ("MUTSA"). MiTek moves for the entry of a preliminary injunction against McIntosh on all claims. For the reasons below, the Court will deny MiTek's Motion for Preliminary Injunction.

**I. Procedural Background**

MiTek filed this action on August 1, 2023, and immediately moved for a temporary restraining order ("TRO"). (ECF Nos. 1, 6). Despite several attempts at service, MiTek was unable to personally serve McIntosh with the Summons, Verified Complaint, Motion for TRO, and Notice of Hearing. (ECF No. 11). MiTek then requested an ex parte hearing on its Motion for TRO. (ECF No. 12). The Court heard oral argument on August 11, 2023, and issued a TRO against McIntosh on August 14, 2023. (ECF Nos. 15, 20). McIntosh filed a motion for rehearing and a motion for

contempt. (ECF Nos. 19, 21). The Court denied the former and the latter remains pending. (ECF No. 20).

McIntosh moved to dissolve the TRO on August 18, 2023. (ECF No. 24). At the hearing on August 28, 2023, both parties presented argument and evidence concerning the dissolution of the TRO. After careful consideration, the Court denied McIntosh's Motion to Dissolve and extended the TRO to September 11, 2023. (ECF No. 43).

The Court held a hearing on MiTek's Motion for Preliminary Injunction on September 8, 2023, at which time MiTek and McIntosh were allowed to present evidence and argument. MiTek presented two witnesses and McIntosh presented none. Both parties have submitted proposed findings of fact and conclusions of law for the Court's consideration. (ECF Nos. 58, 61).

After careful review, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure.

## II. Findings of Fact

1. MiTek provides integrated software, services, engineered products, and automated solutions for the building industry. MiTek's business includes the licensing of truss design software used by its customers to design and fabricate roof trusses, floor trusses, and wall panels using MiTek's metal products. MiTek also manufactures and/or sells automation machinery that its customers use to fabricate trusses and wall panels.

2. McIntosh worked for MiTek as a District Sales Manager or Regional Sales Manager, servicing the Southeast region of the United States, including North Carolina, South Carolina, Georgia, Virginia, and West Virginia.

3.	Around June 2020, MiTek underwent an internal corporate restructuring. As part of the restructuring, MiTek presented McIntosh with an offer letter for the position of Regional Sales Manager. The position came with a pay increase.

4.	As a condition of the salary increase and continued employment, McIntosh was required to enter into the Covenant by Employee ("Covenant"), which contains non-competition, non-solicitation, and non-disclosure provisions.

5.	McIntosh signed the offer letter on July 6, 2020.

6.	McIntosh signed and returned the Covenant by email on July 9, 2022. No representative of MiTek signed the Covenant. No company is listed on the Covenant.

7.	On April 4, 2023, Laura Sarratt, MiTek's Senior Director of Human Resources, met with McIntosh's managers, Todd Snyder (Regional Sales Manager) and Phil Harms (Area Vice President), to discuss concerns they had with McIntosh's job performance.

8.	On April 19, 2023, Snyder and Sarratt met with McIntosh to discuss his future. They gave McIntosh two options: (1) He could accept a performance improvement plan ("PIP"); or (2) He could resign.

9.	During the April 19, 2023, McIntosh told Sarratt and Snyder that he wanted to resign his employment with MiTek. The parties agreed that May 1, 2023, would be McIntosh's final day of employment with MiTek. The parties did not discuss termination.

10.	MiTek offered McIntosh a separation agreement.

11.	McIntosh's resignation was not contingent upon the terms of the separation agreement.

12.	On April 20, 2023, McIntosh sent a text message to Snyder stating that Snyder could tell others that McIntosh was resigning his position.

13. Prior to May 1, 2023, McIntosh told other MiTek employees that he was resigning his position with the company.

14. On April 28, 2023, McIntosh sent an email to Sarratt stating that the terms of the separation agreement were unacceptable and that he intended to continue working for MiTek.

15. McIntosh's last day of employment with MiTek was May 1, 2023.

16. After May 1, 2023, McIntosh accepted new employment as a Regional Eastern Manager at Eagle Metal Products.

17. McIntosh has knowledge of MiTek's trade secret and confidential information including its business plans and strategies, customer lists, customer pricing and purchase volume, expansion plans, products, software, marketing planes, business strategies, research, budgets, forecasts, sales and profits, and other proprietary information relating to MiTek's business.

18. Since May 1, 2023, McIntosh has been in contact with individuals who work for MiTek's customers.

### III. Conclusions of Law

**A. Legal Standard**

In determining whether to issue preliminary injunctive relief, this Court considers the following factors: (1) the probability that the movant will succeed on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury that granting the injunction will inflict on the nonmovant; and (4) the public interest. *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc)). The inquiry is "whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase Sys.*, 640 F.2d at 113.

The likelihood of success is the most important factor. *Roudachevski v. All-Am. Care Centers, Inc.*, 648 F.3d 701, 706 (8th Cir. 2011). This factor directs courts to ask whether the party requesting a preliminary injunction has a "fair chance of prevailing." *Planned Parenthood Minn., N. Dak., S. Dak. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc). Even when a plaintiff has a strong claim on the merits, however, "[f]ailure to demonstrate irreparable harm is a sufficient ground to deny a preliminary injunction." *Phyllis Schlafly Revocable Tr. v. Cori*, 924 F.3d 1004, 1009 (8th Cir. 2019) (quoted case omitted). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). The moving party bears the burden to establish the need for injunctive relief. *Chlorine Inst., Inc. v. Soo Line R.R.*, 792 F.3d 903, 914 (8th Cir. 2015).

### B. Discussion

#### 1. Likelihood of Success on the Merits

To demonstrate a likelihood of success on the merits, a movant need not show that it will ultimately succeed on its claims; rather, it must show that its prospect for success is sufficiently likely to support the kind of relief it requests. *Noodles Dev., LP v. Ninth St. Partners, LLP*, 507 F. Supp. 2d 1030, 1034 (E.D. Mo. 2007) (citing *Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 488 (8th Cir. 1993)). That is, a movant need only show that it has a "fair chance of prevailing." *Planned Parenthood Minn.*, 530 F.3d at 732–33.

##### a. Breach of Contract

The parties do not dispute that Missouri law applies to MiTek's claim for breach of contract. The parties do dispute, however, whether the Covenant constitutes a valid and enforceable contract.

5

The essential elements of a contract under Missouri law are offer, acceptance, and consideration. *Baker v. Bristol Care, Inc.*, 450 S.W.3d 770, 774 (Mo. banc 2014) (citation omitted). "Offer and acceptance 'require there to be a mutual agreement, *i.e.*, a meeting of the minds between the contracting parties, which means the parties meet upon and assent to the same thing, in the same sense, and at the same time.'" *SL EC, LLC v. Ashley Energy, LLC*, 561 F. Supp. 3d 802, 815 (E.D. Mo. 2021) (quoting *EM Med., LLC v. Stimwave LLC*, 626 S.W.3d 899, 907 (Mo. Ct. App. 2021)). In assessing whether there was a meeting of the minds, the Court must consider the parties' "objective manifestations of intent." *Id.* (quoting *Best Buy Builders, Inc. v. Siegel*, 409 S.W.3d 562, 565 (Mo. Ct. App. 2013)).

The elements of a breach-of-contract claim in Missouri are: (1) the existence and terms of a contract; (2) that the plaintiff performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff. *Goldsmith v. Lee Enterprises, Inc.*, 57 F.4th 608, 612 (8th Cir. 2023).

Missouri courts generally enforce non-competition agreements that are "demonstratively reasonable." *Whelan Sec. Co. v. Kennebrew*, 379 S.W.3d 835, 841 (Mo. 2012) (en banc). "A non-compete agreement is reasonable if it is no more restrictive than is necessary to protect the legitimate interests of the employer." *Id.* at 842 (quoted case omitted). The agreement must be narrowly tailored in terms of time and geography, and must protect legitimate employer interests "beyond mere competition by a former employee." *Id.* at 841-42. Under Missouri law, "a noncompete agreement is enforceable 'only to the extent that the restrictions protect the employer's trade secrets or customer contacts.'" *Id.* at 842 (quoting *Healthcare Servs. of the Ozarks, Inc. v. Copeland*, 198 S.W.3d 604, 610 (Mo. 2006) (en banc)). "The employer has the

6

burden to prove that the non-compete agreement protects its legitimate interests in trade secrets or customer contacts and that the agreement is reasonable as to time and geographic space." *Id*.

McIntosh asserts that the Covenant is not valid because it does not identify MiTek as a party and does not contain MiTek's signature. MiTek counters that it assented to the agreement through its conduct.

"[S]ignatures remain a common, though not exclusive, method of demonstrating agreement." *Morrow v. Hallmark Cards, Inc.*, 273 S.W.3d 15, 23 (Mo. Ct. App. 2008). A signature is not required to show mutuality or assent to a written agreement. *Heritage Roofing, LLC v. Fischer*, 164 S.W.3d 128, 134 (Mo. Ct. App. 2005) (citing *Thomas v. O'Brien*, 791 S.W.2d 4, 6 (Mo. Ct. App. 1990)). A party may assent to a contract by its conduct. *Id*. Whether an unsigned writing constitutes a binding contract depends upon the intention of the parties, which is a question of fact that is seldom capable of direct proof. *Id*.

The Court is not persuaded at this juncture that the Covenant constitutes a binding contract. MiTek failed to sign the agreement even though the document contains a signature line for "Company." Immediately above the signature line, the document states: "Accepted and agreed to on behalf of Company." The Covenant further states: "One or more facsimile or e-mail copies of this Agreement collectively bearing the copied *signatures of both parties* shall be treated as an original copy of this Agreement for all purposes." (Emphasis added). The agreement also explains that "[n]o modification, amendment, or waiver of any of the provisions of this Agreement shall be effective or binding unless set forth in a writing signed by the parties hereto and specifically referring to this Agreement."

A trier of fact could reasonably conclude that the language in the Covenant reflects MiTek's intent that its signature is required for mutual assent. *See Baier v. Darden Restaurants*,

7

420 S.W.3d 733, 736 (Mo. Ct. App. 2014) ("The conclusion that a bilateral contract has been formed is *not* self-evident when an offeree signs an *unsigned* proposal. Rather, the absence of the offeror's signature on the proposal presents a question of fact, requiring the trial court to determine the offeror's intent, *i.e.*, whether an 'offer' to enter into a bilateral contract was made, and thus whether the offeror intends to be bound if the unsigned proposal is accepted by the offeree.") (emphasis original) (citation omitted).

To be clear, the Court does not foreclose the possibility that MiTek could establish mutuality with additional evidence. Rather, at this stage—in light of the uncertainty surrounding the enforceability of the Covenant—MiTek has not shown a sufficient prospect for success to warrant the relief sought. *See Noodles Dev.,* 507 F. Supp. 2d at 1034. For that reason, the "likelihood of success" factor weighs in McIntosh's favor on the breach-of-contract claim.

### b. Tortious Interference

The elements of tortious interference with a business relationship are: (1) The plaintiff was involved in a valid business relationship; (2) the defendant was aware of the relationship; (3) the defendant intentionally interfered with the relationship, inducing its termination; (4) the defendant acted without justification; and (5) the plaintiff suffered damages as a direct result of defendant's conduct. *Topper v. Midwest Div., Inc.*, 306 S.W.3d 117, 125 (Mo. Ct. App. 2010).

There is no evidence that McIntosh induced the termination of any of MiTek's business relationships. MiTek cannot show a sufficient prospect for success on this claim to warrant the relief sought. *See Noodles Dev.,* 507 F. Supp. 2d at 1034. This factor weighs in McIntosh's favor.

### c. The Defend Trade Secrets Act and the Missouri Uniform Trade Secrets Act

To state a claim for misappropriation of a trade secret under the DTSA, a plaintiff must show that "the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). The DTSA defines a trade secret as:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—(A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3).

A misappropriation may occur in any of three ways: (1) a person acquires the trade secret while knowing or having reason to know that he or she is doing so by improper means; (2) a person who has acquired or derived knowledge of the trade secret discloses it without the owner's consent; or (3) when a person who has acquired or derived knowledge of the trade secret uses it without the owner's consent. 18 U.S.C. § 1839(5); *see also LifeScience Techs., LLC v. Mercy Health*, 632 F. Supp. 3d 949, 956 (E.D. Mo. 2022).

A claim for misappropriation of trade secrets under the MUTSA has three elements: (1) the existence of protectable trade secrets, (2) misappropriation of the trade secrets by the defendant, and (3) damages or entitlement to injunctive relief. *Secure Energy, Inc. v. Coal Synthetics, LLC*, 708 F. Supp. 2d 923, 926 (E.D. Mo. 2010); *Cent. Tr. & Inv. Co. v. Signalpoint Asset Mgmt., LLC*, 422 S.W.3d 312, 320 (Mo. 2014) (en banc). Missouri law defines a trade secret as:

9

>information, including but not limited to, technical or nontechnical data, a formula, pattern, compilation, program, device, method, technique, or process, that: (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Mo. Rev. Stat. § 417.453(4).

Misappropriation is defined as:

> (a) Acquisition of a trade secret of a person by another person who knows or has reason to know that the trade secret was acquired by improper means; or
> (b) Disclosure or use of a trade secret of a person without express or implied consent by another person who:
>    a. Used improper means to acquire knowledge of the trade secret; or
>    b. Before a material change of position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake; or
>    c. At the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was:
>        i. Derived from or through a person who had utilized improper means to acquire it;
>        ii. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>        iii. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

Mo. Rev. Stat. § 417.453(2). *See also Secure Energy, Inc.*, 708 F. Supp. 2d at 926.

McIntosh has knowledge of MiTek's trade secret and confidential information. But under both the DTSA and MUTSA, MiTek must show that McIntosh misappropriated that information. At this point in the litigation, MiTek has made no such showing.[1] MiTek simply asserts upon

---

[1] MiTek has suggested throughout this litigation that McIntosh sent confidential information to his personal email address before leaving MiTek. In fact, MiTek indicated on its "Exhibit List for Preliminary Injunction Hearing" that it may introduce the email as Exhibit 5 at the hearing. (ECF No. 50). MiTek did not, however, publish Exhibit 5 during the hearing or move for its admission.

information and belief that "McIntosh intends to or will inevitably utilize MiTek's confidential information and/or trade secrets in performing his work for Eagle Metal Products[.]" (ECF No. 1 at ¶ 4). Courts refer to MiTek's future-misappropriation theory as the "inevitable-disclosure doctrine" and repeatedly emphasize that it poses a high bar. *Prime Therapeutics LLC v. Beatty*, 354 F. Supp. 3d 957, 969 (D. Minn. 2018) (citations omitted). Courts that have applied the doctrine consider several factors in determining whether misappropriation is inevitable, including: (1) the degree of competition between the plaintiff and a defendant's new employer, (2) the extent to which the defendant's new position is similar to the position he held with the plaintiff, and (3) the actions the plaintiff has taken to prevent the defendant from using or disclosing the plaintiff's trade secrets. *Id.* (citations omitted).

Missouri courts have neither accepted nor rejected the inevitable-disclosure doctrine. *See* Randall E. Kahnke, et al., *Doctrine of Inevitable Disclosure*, https://ipo.org/wp-content/uploads/2013/04/DoctrineofInevitableDisclosure.pdf (Sept. 2008); *see also Bus. Mach. Corp. v. Seagate Tech., Inc.*, 941 F. Supp. 98, 101 n.1 (D. Minn. 1992) ("The Eighth Circuit has neither accepted nor rejected the 'inevitable disclosure' doctrine."). In the absence of controlling authority, the Court will decline to apply the doctrine in this case. *See Conseco Fin. Servicing Corp. v. N. Am. Mortg.*, No. 00CV1776, 2000 WL 33739340, at *12 (E.D. Mo. Dec. 6, 2000), *aff'd sub nom. Conseco Fin. Servicing Corp. v. N. Am. Mortg. Co.*, 24 F. App'x 655 (8th Cir. 2002) (declining to apply the inevitable-disclosure doctrine absent controlling authority from the Eighth Circuit).

Even if the doctrine were settled law in this jurisdiction, MiTek has not met the heavy burden of showing inevitable disclosure. At the preliminary-injunction hearing, Snyder testified that Eagle Metal offers some but not all of the same products and services as MiTek. And while

11

McIntosh's new job at Eagle Metal is substantially similar to his position with MiTek, there is no evidence in the record to suggest that McIntosh will use MiTek's proprietary information to poach MiTek's customers. McIntosh states in his declaration that he has not "used or disclosed any MiTek confidential information or trade secrets." (ECF No. 32-3). Baird Quisenberry, President of Eagle Metal, states in his declaration that "Mr. McIntosh has been instructed and has agreed not to share any confidential information or trade secrets he learned from MiTek with anyone at Eagle." (ECF No. 32-7).

McIntosh's evidence certainly does not preclude the possibility that MiTek could succeed on these claims in the future, but "[s]peculative harm does not support a preliminary injunction." *MPAY Inc. v. Erie Custom Computer Applications, Inc.*, 970 F.3d 1010, 1020 (8th Cir. 2020) (quoted case and internal quotation marks omitted). MiTek has not shown a sufficient prospect for success to warrant the relief sought. *See Noodles Dev.*, 507 F. Supp. 2d at 1034. Here again, this factor weighs in McIntosh's favor.

### 2. Irreparable Harm

"Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (citation omitted). MiTek must show that the harm is "certain and great and of such imminence that there is a clear and present need for equitable relief." *Gen. Motors Corp.*, 563 F.3d at 319 (citing *Iowa Utils. Bd. v. Fed. Commc'ns Comm'n*, 109 F.3d 418, 425 (8th Cir. 1996)). Speculative harm does not support a preliminary injunction. *MPAY Inc.*, 970 F.3d at 1020.

As explained above, there is no evidence in the record that MiTek has suffered irreparable harm or that such harm is certain and imminent. At this stage, all of MiTek's claims are based on speculative future harm. Thus, even if MiTek could establish a sufficient prospect for success on

any of its claims, a preliminary injunction would be inappropriate. This factor weighs in McIntosh's favor.

### 3. The Balance of Harms

"The balance of harms analysis examines the harm of granting or denying the injunction upon both of the parties to the dispute and upon other interested parties, including the public." *Noodles Dev.,* 507 F. Supp. 2d at 1038 (cleaned up). An illusory harm to the movant will not outweigh any actual harm to the non-movant. *Id.* (citing *Frank B. Hall & Co. v. Alexander & Alexander, Inc.*, 974 F.2d 1020, 1025 (8th Cir.1992)).

The Court previously determined that this factor weighed in MiTek's favor. (ECF No. 20 at 10). But in light of MiTek's lack of evidence and its reliance on seemingly illusory harm, the Court now finds that this factor weighs in neither party's favor. While the Covenant remains narrow in temporal and geographic scope, there are substantial questions surrounding its enforceability. What is more, the narrowness of the Covenant, even if valid, does not negate the speculative nature of the harm to MiTek. This factor does not tip the scales in either party's favor.

### 4. Public Interest

Finally, the evidence before the Court fails to establish that a preliminary injunction is necessary to protect the public interest. This Court previously ruled in MiTek's favor on this factor because the enforcement of reasonable restrictive covenants serves the public interest. (ECF No. 20 at 11) (citing *Schott v. Beussink*, 950 S.W.2d 621, 625 (Mo. Ct. App. 1997)). But as explained throughout this order, the enforceability of the Covenant is now questionable. And while the public also has an interest in protecting trade secrets (*see Conseco Fin. Servicing Corp. v. N. Am. Mortg.*, 2000 WL 33739340, at *12), there is simply no evidence in the record to show that McIntosh has

disseminated or will disseminate MiTek's confidential information. This factor weighs in neither party's favor.

## IV. Conclusion

Having thoroughly reviewed the record in this case, including pleadings, exhibits, deposition testimony, and evidence presented at the preliminary injunction hearing, the Court concludes that the balance of equities does not favor the entry of a preliminary injunction. The Court has carefully considered the four *Dataphase* factors and finds MiTek has not established that it is likely to prevail on any of its claims or that there is a significant threat of irreparable harm to MiTek absent an injunction. *Dataphase Sys.*, 640 F.2d at 113.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff MiTek Inc.'s Motion for Preliminary Injunction against Defendant Mike McIntosh is **DENIED**. (ECF No. 38).

*Ronnie L. White*
**RONNIE L. WHITE**
**UNITED STATES DISTRICT JUDGE**

Dated this 11th day of September, 2023.